UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:07-00066 |
| | ) | Judge Echols |
| TRAVIS DESHAN STEWART | ) | |

## MEMORANDUM

Pending before the Court is Defendant Travis Deshan Stewart's "Motion to Suppress Evidence Resulting From an Unlawful Stop and Search" (Docket Entry No. 17), to which the Government has responded in opposition. The Court held an evidentiary hearing on the Motion on June 14, 2007.

## I. FACTUAL FINDINGS

During the course of the evidentiary hearing, the Court heard from numerous witnesses. Having heard the testimony of the witnesses, and considering their interests and demeanor, the Court finds the following to be the relevant facts.[1]

Officers Roderick Jones ("Officer Jones"), Michael Wilson ("Officer Wilson"), and Shane Fairbanks ("Officer Fairbanks") of the Metropolitan Nashville Police Department are assigned to the East Division Flex Team. The Flex Team is a unit which works high crime areas, concentrating on drug, weapon and prostitution crimes.

---

[1] Because these are the Court's findings, any contrary testimony on a specific matter has been rejected in favor of the specific fact found.

1

Around 11:30 a.m. on August 15, 2006, Officer Jones was patrolling in a marked police cruiser in the area of Leland Street and Bronte Avenue in Nashville, Tennessee. That area had recently been the site of a rash of burglaries.

Officer Jones drove down Bronte Avenue and turned onto Leland Street where he observed four black males walking towards him on the opposite side of the street. As he approached the group, Officer Jones saw one of the individuals, the Defendant herein, suddenly break from the others and enter an intersecting alley, while the others continued down Leland Street.

Officer Jones slowed down and watched the Defendant walk a few feet down the alley. Though the alley was lined with some bushes, Officer Jones had a clear view of the Defendant and, because of Defendant's suspicious behavior, Officer Jones wanted to see if Defendant was going to come out of the alley and rejoin his group. In only a few moments, Defendant walked out of the alley and rejoined his companions walking down the street.

Officer Jones thought Defendant's activity was suspicious so he drove slowly past the group but kept them in sight in his rearview mirror to see if the Defendant would go back to the alley after he passed. He observed Defendant turn around and go back into the alley where he had been. Officer Jones then turned his patrol car around and drove back toward the alleyway and parked his vehicle to watch Defendant.

Officer Jones observed the subject talking on his cellphone and walking down the alley. Defendant then turned around and started walking back toward the front of the alley where Officer Jones was parked. Officer Jones moved his patrol car to the front of the alley so he could talk to the Defendant.

2

As the Defendant approached his vehicle, Officer Jones lowered the window of his patrol car and asked the Defendant his name. Defendant gave Officer Jones his driver's license which indicated that he was Travis Deshan Stewart. A check by Officer Jones revealed no outstanding warrants against the Defendant.

Officer Jones then asked Defendant what he was doing in the area and Defendant told him he was waiting for his brother to come pick him up at the Dollar General Store and give him a ride. However, at the time that Officer Jones first observed Defendant and his friends on Leland Street, they were walking in a direction away from Dollar General, and Defendant would have had to circle the block to reach the Dollar General on Gallatin Road. Officer Jones noted the discrepancy but told the Defendant to have a nice day and allowed him to continue on his journey.

After his encounter with Defendant, Officer Jones spoke to other Flex Unit officers on the talk-around channel,[2] told them what he had observed, and asked for assistance in searching the alleyway. Officer Wilson, followed by Officer Fairbanks, responded to the call.

Upon the responding officers' arrival, Officer Jones told them where he had observed and where the Defendant left the group and entered the alley for a short time before rejoining the others. The three officers drove back to the alley and began to search the area, and Officer Jones proceeded to the Dollar General store. Several feet into the alley from the street, Officer Wilson observed a plastic baggie lying on top of weeds just inside a square wire woven fence on the left side of the alley. Officer Wilson reached through the opening and retrieved the baggie. The baggie was dry, even though everything else in the area was damp or wet from a rain the previous night. The baggie

---

[2] The talk-around channel allows officers on the same radio frequency to communicate directly from car-to-car, without funneling their communications through dispatch.

appeared to contain crack cocaine, and subsequent testing indicated it contained 2 grams of crack cocaine.

Upon finding the crack cocaine in the baggie, the three officers called Officer Jones and proceeded to the Dollar General Store on Gallatin Road to assist in finding the Defendant. Defendant was located outside the Dollar General Store, placed under arrest for possessing crack cocaine, and handcuffed by Officer Jones. Officer Jones began searching the Defendant's pockets and the contents were placed on the trunk of a patrol car. When Officer Jones found a set of car keys in Defendant's pocket and asked him about them, Defendant stated that the keys were not his and he did not know to whom they belonged. Officer Jones then asked Officer Fairbanks to take the keys and go back to the area around the alley to try to find the Chevrolet or General Motors vehicle which matched the General Motors logo on the key. Officer Fairbanks went back to the alley and began pressing the keyless entry pad but it appeared not to be working. He then tried the key to unlock the trunk of a nearby white Chevrolet Impala and he heard it unlock the trunk. Without looking inside the trunk, Officer Fairbanks immediately pushed the trunk lid back down and walked to the passenger door to determine if the key would unlock the door. The same key also unlocked the car door and Officer Fairbanks immediately shut the door. He then walked to the house where the Impala was parked and spoke to the residents of the house. They informed him that the car was not owned by them.

Officer Fairbanks radioed Officer Jones that he found the car which the key fit, and Officer Jones placed Defendant in the back of Officer Jones' patrol and drove him to the location of the Chevrolet Impala. Officer Wilson followed.

By this time, the officers' supervisor, Sgt. Whitley, had arrived on the scene. He called for a K-9 unit, and Lt. Ken Spencer and Aeros, his Belgian Malinois, responded.[3] Lt. Spencer walked Aeros around the Impala, and Aeros alerted on the passenger door by barking and scratching at the door. Afterwards, the car door was opened and Aeros immediately alerted on the ashtray area in the front seat of the vehicle.

The officers then searched the vehicle and found 2.7 grams of powder cocaine in the ashtray, 1.7 grams of marijuana in the glove box, a loaded .40 caliber Smith and Wesson handgun under the driver's seat, and an envelope with Defendant's name on it somewhere in the vehicle.

After the discovery of the contraband, Officer Jones went back to his patrol car and read Defendant his Miranda rights. Officer Jones then told Defendant they had found drugs and a gun in the Impala, and Defendant admitted that everything found in the Impala belonged to him.

The Impala was towed to the Metro impound lot. Later, it was repossessed by Recovery One and sold by the Auto Auction to Goss Suzuki, which in turn sold it to a private individual. An investigator for the Defendant was able to obtain the key ring Defendant possessed at the time of his arrest from Recovery One. That key ring contained four house keys, and a car key and keyless entry device for a 1997 Mercury, but the key to the Chevrolet Impala was not on the key ring because this key was given to Auto Auction when the Impala was being sold. According to the testimony of a certified General Motors master technician, the white Chevrolet Impala in this case has never been equipped with a keyless entry system. That was the reason the Impala did not respond to the keyless entry device used by Officer Fairbanks when he was trying to locate the car which matched the keys

---

[3] Lt. Spencer and his dog are certified in narcotics detection by the United States Police Canine Association. Aeros' abilities as a narcotics detection dog have not been challenged.

5

Case 3:07-cr-00066   Document 30   Filed 07/25/07   Page 5 of 10 PageID #: 207

in Defendant's pocket. In fact, the keyless entry device retrieved from Defendant's pocket was embossed with a Mercury Logo and matched a Mercury automobile, not a Chevrolet Impala.

On March 21, 2007, a federal grand jury returned a one-count Indictment charging the Defendant with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a). The pending Motion to Suppress followed.

## II. APPLICATION OF LAW

Defendant argues that after he produced a valid driver's license, police officers had no further justification to detain him and when they found the crack cocaine in the alley, they had no basis to arrest him. He also claims that the subsequent search of his vehicle was impermissible.

"Encounters between police officers and citizens can be grouped into three categories: 'consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked some questions; a temporary involuntary detention or Terry stop which must be predicated upon reasonable suspicion; and arrests which must be based on probable cause.'" United States v. Campbell, 2007 WL 1501281 at *3 (6th Cir. 2007) quoting, United States v. Bueno, 21 F.3d 120, 123 (6th Cir. 1994). In this case, Defendant's initial encounter was consensual. Defendant approached Officer Jones in his patrol car, showed him his license, answered a few questions through the car window and was left to go on his way. The critical question is whether the subsequent encounter which occurred after the crack cocaine was found constituted a Terry stop or an arrest and whether, regardless of the characterization, it was prohibited by the Fourth Amendment.

In order for a seizure to comply with the Fourth Amendment, "the police officer must have a reasonable suspicion of criminal activity to justify a Terry stop, or probable cause to justify an

6

Case 3:07-cr-00066   Document 30   Filed 07/25/07   Page 6 of 10 PageID #: 208

arrest[.]" Id. A Terry stop allows officers to briefly detain and question a suspect based upon reasonable suspicion that the suspect had been or is presently involved in a crime. Hayes v. Florida, 470 U.S. 811, 816 (1985). During such a stop, a police officer may handcuff the suspect if the officer fears for his or her own safety, and the mere handcuffing does not transform the stop into an arrest. United States v. Atchley, 474 F.3d 840, 848 (6th Cir. 2007). An arrest, on the other hand, occurs when a reasonable individual in the suspect's circumstances would believe that he was in custody and not free to leave. Merkemer v. McCarty, 468 U.S. 420, 422 (1984).

In this case, the Government concedes that after the crack cocaine was found, Defendant was placed under arrest. The Government asserts, however, that the arrest was valid because it was based upon probable cause. This Court agrees.

After Officer Wilson found the crack cocaine in the alleyway, the officers traveled to the Dollar General Store and found the Defendant outside. Officer Jones told Defendant he was under arrest for possessing crack cocaine and placed the Defendant in handcuffs. This constituted an arrest since any reasonable person in Defendant's position would have believed he was in custody and not free to leave. See, United States v. Robinson, 2007 WL 507875 at *4 (6th Cir. 2007). The issue then becomes whether there was probable cause to make the arrest.

A warrantless arrest is constitutionally valid if, "at the moment the arrest was made, the officers had probable cause to make it-whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [individual] had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91 (1964). "Probable cause is determined by the totality of

7

the circumstances 'from a law enforcement officer's perspective.'" United States v. Craig, 198 Fed. Appx. 459, 462 (6th Cir. 2006) quoting, United States v. Ferguson, 8 F.3d 385, 392 (6th Cir. 1993).

The totality of the circumstances suggest that a reasonable officer in Officer Jones' position would believe that probable cause existed to arrest Defendant for possession of crack cocaine. At the time of the arrest, Officer Jones was patrolling an area where there had been numerous burglaries. He saw a group of individuals walking down the street towards him. When Defendant saw Officer Jones' marked patrol car, he split off from his friends and abruptly turned into an alleyway, but walked down the alley only a few feet. Defendant then exited the alleyway and rejoined his friends. However, when Officer Jones' patrol car had passed, Defendant again left his friends to re-enter the alley only to exit again a short time later. Upon exiting the alley for the second time, Defendant was asked what he was doing and Defendant replied that he was waiting for his brother to pick him up at the Dollar General Store on Gallatin road, even though Defendant and his companions had been walking in a direction away from the store. After Defendant was permitted to go on his way, the officers were suspicious of Defendant's behavior and they searched the area of the alley where Defendant had first entered and found a baggie containing crack cocaine. That baggie was not wet even though litter and other items in the alley were wet because it had rained the night before. Officer Jones had probable cause to believe that Defendant left the baggie there to avoid detection since he had just entered and exited the alley where the baggie was found and he was the only one seen entering the alley.

Because Officer Jones had probable cause to arrest the Defendant, he could then search the Defendant incident to that arrest. "Under the 'search-incident-to-a-lawful arrest' exception to the

8

warrant requirement, a law enforcement officer may conduct a full search of an arrestee's person incident to a lawful custodial arrest." United States v. Montgomery, 377 F.3d 582, 586 (6th Cir. 2004). That lawful search revealed a set of keys, which included car keys and a keyless entry device.

Officer Fairbanks' use of the keyless entry device in trying to find the automobile that matched the keyless entry device did not affect anyone's privacy rights since it did not work.[4] After all, the keyless entry device was to a Mercury. Officer Fairbanks' subsequent use of a key to unlock the trunk and passenger door and immediately close them did not violate the Fourth Amendment. "[T]he mere insertion of a key into a lock, by an officer who lawfully possesses the key and is in a location where he has a right to be, to determine whether the key operates the lock is not a search." United States v. Salgado, 250 F.3d 438, 456 (6th Cir. 2001) citing United States v. DeDardeleben, 740 F.2d 440, 444-45 (6th Cir. 1975)(holding that the insertion of key into lock of an automobile solely for the purpose of identifying ownership does not constitute a search).

Upon discovering that the key on Defendant's key ring fit locks to the Impala, Sergeant Whitley prudently called for a K-9 unit. The K-9 dog Aeros walked around the Chevrolet Impala

---

[4]During the course of the evidentiary hearing, Defendant made much of the fact that the Impala driven by the Defendant was not equipped with a keyless entry device. That is largely irrelevant since the evidence shows that Officer Fairbanks opened the trunk and passenger door lock with a key found on Defendant's key ring when he was searched pursuant to his arrest and there is no contention that he did not have a key to the white Chevrolet Impala, or that the key was not found on the Defendant. To the extent Defendant is attempting to cast doubt on Officer Jones' report which indicates that the Impala was opened with a keyless entry device, the Court finds the officers' testimony credible. Officer Jones knew that Officer Fairbanks left with a set of keys which contained a keyless entry device. When Officer Fairbanks radioed back that the vehicle had been unlocked, Officer Jones may have assumed that it had been unlocked with the keyless entry device, instead of a key. Regardless, the fact remains that the trunk and a door to the Impala were opened with a key and immediately shut prior to any search.

9

and subsequent "hit" on the passenger door, but this did not constitute a search within the meaning of the Fourth Amendment because the use of a well-trained drug dog to sniff for drugs does not implicate any legitimate privacy interests. Illinois v. Caballes, 125 S.Ct. 834, 837-38 (2005). After Aeros "hit" on the car, the officers search of the Chevrolet Impala was lawful since "[t]here is probable cause to justify a warrantless search of a vehicle once a properly trained and reliable drug detection dog alerts positively to the presence of drugs." United States v. Perez, 440 F.3d 363, 374 (6th Cir. 2006).

Based upon the evidence presented, the Court concludes that probable cause existed to arrest the Defendant. The Court further finds that the subsequent search of his Impala did not violate the Fourth Amendment.

### III. CONCLUSION

For the foregoing reasons, Defendant's "Motion to Suppress Evidence Resulting From an Unlawful Stop and Search" (Docket Entry No. 17) will be denied.

An appropriate Order will be entered.

*[signature]*

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE